# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

―――――――――――

**No. ACM 22072**

―――――――――――

**UNITED STATES**
*Appellee*

**v.**

**John P. MATTI**
Airman First Class (E-3), U.S. Air Force, *Appellant*

―――――――――――

Appeal from the United States Air Force Trial Judiciary[1]

Decided 28 February 2025

―――――――――――

*Military Judge*: Elijah F. Brown.

*Sentence*: Sentence adjudged 23 June 2022 by SpCM convened at Luke Air Force Base, Arizona. Sentence entered by military judge on 28 July 2022: Confinement for 75 days, forfeiture of $1,222.00 pay per month for two months, reduction to E-1, and a reprimand.

*For Appellant*: Major Nicole J. Herbers, USAF.

*For Appellee*: Major Vanessa Bairos, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Judge WARREN joined. Judge GRUEN filed a separate dissenting opinion.

―――――――――――

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

―――――――――――

―――――――――――

[1] Appellant appeals his convictions under Article 66(b)(1(A), Uniform Code of Military Justice, 10 U.S.C. § 866(b)(1)(A) (*Manual for Courts-Martial, United States* (2024 ed.)).

JOHNSON, Chief Judge:

Appellant pleaded not guilty to four specifications of assault consummated by battery on his spouse (CC), in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[2] A special court-martial composed of officer and enlisted members found Appellant guilty of the charge and two specifications, and not guilty of two specifications. Appellant elected to be sentenced by the military judge, who imposed confinement for 75 days, forfeiture of $1,222.00 pay per month for two months, reduction to the grade of E-1, and a reprimand. Appellant did not request any deferments of confinement, forfeitures, or reduction in grade. The convening authority took no action on the findings or sentence.

Appellant raises six issues on appeal: (1) whether trial counsel engaged in prosecutorial misconduct during his findings argument and rebuttal; (2) whether it was plain error for the military judge to admit lay witness testimony regarding bruising or, in the alternative, whether Appellant received ineffective assistance of counsel when trial defense counsel failed to object to lay witness testimony regarding bruising; (3) whether the military judge abused his discretion in allowing a witness to testify to certain uncharged bad acts allegedly committed by Appellant; (4) whether the military judge abused his discretion in denying a defense request for an alibi instruction; (5) whether Appellant received ineffective assistance of counsel when trial defense counsel failed to seek assistance from an expert to explain whether the documented injuries were consistent with the alleged crimes; and (6) whether Appellant's conviction and sentence should be set aside because Appellant was entitled to a unanimous verdict.[3] In addition, although not raised as an assignment of error, we consider (7) whether Appellant is entitled to relief for unreasonable appellate delay. We have carefully considered issue (6) and find it does not warrant discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023) (holding an accused servicemember does not have a constitutional right to a unanimous court-martial verdict), *cert. denied*, 114 S. Ct. 1003 (2024). As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

---

[2] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant personally raises issues (3), (4), (5), and (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND[4]

CC met Appellant when they were both living in Missouri, before Appellant joined the Air Force. They began dating in December 2019. In March 2020, Appellant departed Missouri to attend Air Force basic training, followed by technical training. Appellant and CC married while they were apart in order for Appellant to arrange for them to live together off base once he reached his permanent duty station at Luke Air Force Base (AFB), Arizona.

CC moved to Arizona to live with Appellant in late August or early September 2020. Although CC initially enjoyed living with Appellant, they began to argue frequently. In approximately the beginning of October 2020, Appellant and CC took in a roommate, Airman First Class (A1C) AA, in order to save money. At trial, A1C AA testified that beginning approximately a week after he moved in, he observed Appellant and CC would argue "nonstop" on a daily basis; the arguments he observed were usually about financial issues and Appellant usually initiated them. According to CC, another point of friction between Appellant and CC was Appellant's viewing of adult websites and other media, and particularly Appellant communicating with other women through such sites and media. CC testified the arguments became worse after A1C AA moved out in January 2021.

In January 2021, Appellant and CC were watching television together; Appellant was lying against CC, who had her arm across his chest. Appellant made a comment that a woman on television had large breasts. In response, CC asked Appellant why he was with her if he wanted someone with large breasts. Appellant then leaned over and bit CC on the forearm. The bite was painful and left a bruise that lasted for one or two weeks. CC began to cry and asked Appellant why he bit her. Appellant said he bit her because he "wanted to," and told her if she was going to cry she "needed to go in the room." CC then went into another room.

At the time, CC had a job working overnight shifts in a department store. Her work included moving boxes and merchandise around the store. SM, who worked with CC at the store between November 2020 and January 2021, testified that in "early 2021" CC came to work with "a few bruises." On cross-examination, trial defense counsel asked SM, "You're not exactly sure when in that period [that SM and CC worked together] you saw [the bruises]?" SM replied, "Just throughout periodically. Like she always wore a jacket so it was really when she wasn't wearing long sleeves and you could catch glimpses of

---

[4] Unless otherwise indicated, the following background is drawn from CC's trial testimony.

it."[5] SM testified that at the time she saw the bruises, SM and CC "discussed . . . a little bit" whether the bruises were the result of physical abuse, but at that point CC denied it. However, several months later in June 2021—after CC had moved out of Appellant's house—CC told SM that Appellant had caused the bruises.

CC's sister testified that CC visited her around 8 May 2021. During the visit, CC told her sister that CC and Appellant "were having some issues and arguing a lot." CC then told her sister that if the sister "knew everything that had been going on that [she] wouldn't let [CC] [go] back home" to Arizona.

On 21 May 2021, Appellant was using CC's phone and accessed her account to an online retailer to order supplies for his car-detailing business. When Appellant refused to return the phone to CC and went into the garage, CC picked up Appellant's phone in the kitchen and looked at it. She saw Appellant was following a woman on Snapchat who had posted images of herself wearing lingerie. When Appellant returned to the kitchen, CC showed him his phone and asked him, "[D]o you think she's cute"? Appellant responded, "okay, that's it," walked to where CC was sitting on a stool, and grabbed her wrists from behind. Appellant lifted CC's arms, forcing her off of the stool. CC told Appellant to let go and that he was hurting her, but he refused. CC tried to kick at Appellant with her leg, but Appellant raised her arms further, causing her to fall onto her knee and then onto her chin, which "hurt pretty bad." Appellant then put his knee on CC's back between her shoulder blades with most but not all of his body weight. CC screamed at Appellant to let go of her and that he was hurting her, but he refused. Appellant then told CC, "[I]f you wouldn't have resisted, this wouldn't have happened." CC then lay and waited for what she estimated to be a minute before Appellant got off her.

CC testified this incident occurred in the afternoon, before her work shift started at 1430 or 1500. At the time, CC no longer worked at the department store and was working for another company located approximately 20 to 25 minutes away from their house. CC went to work at the usual time that day, finishing her shift just after 1900. After work, CC went to the home of a coworker, CS, before returning home around 2200. CC testified that after she returned home she used her phone to photograph bruises on her leg and chin

---

[5] SM's testimony that she saw the bruise or bruises when CC's arms were not covered by long sleeves thus implied the bruise or bruises were on CC's arm. SM was not asked and did not testify whether the bruises appeared to be bite marks.

that resulted from the earlier incident with Appellant; the bruises lasted for approximately two weeks.[6]

CC's co-worker CS testified at trial that CC came to work with a bruise on her chin in mid- or late-May 2021. CS also testified CC came to CS's home on 21 May 2021, which was the only time CC came to her house. CS further testified that around that time, CC told CS that Appellant physically abused CC.

At trial, the Government introduced photographs CC took of her leg and chin on 21 May 2021. Contrary to CC's testimony, the time stamps indicate the photographs were taken at 1058 and 1104 on that date.

CC moved out of the house on 11 June 2021 and went to Florida, where her parents lived. Approximately two weeks later, CC reported Appellant's physical abuse of her to law enforcement. Appellant and CC were divorced on 28 December 2021.

## II. DISCUSSION

### A. Trial Counsel Findings Argument

#### 1. Additional Background

Trial counsel began his argument on findings by commenting on the statements CC made to her sister around 8 May 2021, and by arguing that Appellant's motive was to use physical force to control CC when she confronted him about his apparent interest in other women. Trial counsel then told the court members he wanted them to consider "three specific areas," including: (1) that the "allegations" and "narrative [they have] been told" through the evidence "makes sense" and "rings true;" (2) that the evidence satisfies the elements of the offenses; and (3) that "you have a credible witness. You have the victim, [CC], who came up here and took the stand and she was credible. She doesn't have a reason to lie. She doesn't have any reason to make this up."

Trial counsel then reviewed the evidence at some length, arguing that CC's testimony was significantly corroborated and presented a narrative that "makes sense" and met the elements of the charged offenses. At one point, while addressing the elements of the offenses, trial counsel stated: "in talking about these [elements], starting actually from the bottom, that she was the

---

[6] CC testified regarding two other charged instances of assault consummated by battery Appellant allegedly committed against CC in January or February 2021. The court members found Appellant not guilty of those alleged offenses, the details of which are unnecessary for this opinion.

spouse, that of course is not at issue. There has been no evidence provided that she wasn't [the spouse] and they talked about the fact that they were married."

At the conclusion of the argument, trial counsel returned to the subject of CC's credibility:

> Now finally we need to talk about the credibility of the witness because this is important. Members, you have the absolute responsibility to determine the credibility of witness. The judge instructed you, you have that duty; that you must consider each witness[']s intelligence, ability to observe and accurately remember, their sincerity and their conduct in court, prejudices, and their character for truthfulness, and you have not been provided with any real reason to doubt the credibility of this witness. She's telling the truth. What does she have to gain by not telling the truth? Let's again talk [about what] this case isn't. This case isn't an ugly, you know, marriage dispute. This case isn't a sexual assault case where you caught me cheating on my boyfriend and now the only thing I can do is claim sexual assault to get out of it. This case isn't "hey, I want child-support for my children or I want custody of my children and the easiest way to do that is to claim physical abuse." There are potential motivations out there for why a victim might make a false claim. You have not been provided with any reasonable explanation as to why [D]efense just wants to get up here and say it's a lie, it's a lie, it's all lies. Think about the benefits for [CC] of reporting a domestic violence[7] claim. She has to do these investigative interviews

---

[7] Appellant does not include trial counsel's reference to "domestic violence" in his assignments of error. Article 128b, UCMJ, 10 U.S.C. § 928b, exists as a separate offense of "Domestic Violence," distinct from assaults under Article 128, UCMJ. Appellant was charged with assault consummated by battery in violation of Article 128, UCMJ, rather than domestic violence in violation of Article 128b, UCMJ. Trial counsel evidently referred to "domestic violence" consistent with a lay person's understanding of the term as "violent or abusive behavior directed by one family or household member against another." MERRIAM-WEBSTER, *Domestic Violence*, https://www.merriam-webster.com/dictionary/domestic%20violence (last visited 21 Feb. 2025). Although trial counsel's reference to "domestic violence" was potentially objectionable, we do not find a *clear or obvious* error in light of the common definition of the term. *See United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (holding that absent objection, alleged errors in trial counsel's argument are reviewed for plain error); *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (setting forth the criteria for plain error review). Assuming

which you've heard briefly about from the [Air Force] Office of Special Investigations. Yeah, that's really fun to go and put your entire marital life -- your failed marriage to these law enforcement officials. She's had to go through prosecutor interviews, defense interviews, her courtroom testimony in front of you, the direct and cross-examination sitting up here for hours on the stand as we dig through any text messages she might have ever had and confront her on all those things. Members, it's not for the faint of heart to testify in court. It is a long, drawn out, difficult experience for [CC]. What possible motivation does she have? She's already got the divorce. She has nothing financial to gain from this. There is no benefit. She told you what the only benefit was; it[']s closure. It's trying to have justice done. [It i]s the concern that he might go out and do this to someone else; that that can happen. He needs to be held accountable. You saw her and you saw her credibility, and you saw the credibility of the other witnesses; those people who received her outcry, who heard her talk about what was going on in her marriage, of those people who saw her bruises. The [D]efense needs to get up here and say that all of these people are just lying to you; that it's all one giant conspiracy theory. None of it makes sense. Members, what they're going to do with that is trying to tell you that if there's any doubt at all, if there's any conspiracy theory they can sell then you need to find him not guilty. That is not true. The judge instructed you on the reasonable doubt standard and what that means, and you will have these instructions so read over them carefully. . . . The [D]efense can get up here and give you all sorts of doubts, all sorts of possible doubts, possible explanations, possible reasons why this might all just be a conspiracy theory, how [CC] months before reporting this was getting bruises just to show people and they just happen to all notice and have concern that she was being physically abused, that she

---

*arguendo* the reference to "domestic violence" was a plain or obvious error, we find Appellant was not unfairly prejudiced and Appellant was convicted on the basis of the evidence alone. *See United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021). Court members are presumed to follow the military judge's instructions in the absence of evidence to the contrary. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000). In this case, the court members were instructed on the elements of assault consummated by a battery in violation of Article 128, UCMJ, the offenses of which Appellant was convicted.

was laying little breadcrumbs talking to all sorts of different people, [CS], her dad, her sister, later [Appellant's] parents, and all of this was a[ ]part of an elaborate scheme that I'm going to be prepared after I leave you to potentially report you for a crime, a crime that I have nothing to gain from. Is that a doubt? Is that an explanation? Maybe. Is it reasonable; absolutely not. Members, you absolutely should be firmly convinced that you know what's happened here, that this is the case of a woman who has endured multiple abuses, physical control from her husband, and he absolutely must be held accountable for what he's done, which is why the Government asks that you find him guilty of all specifications.

Trial counsel began his rebuttal argument for findings by stating, "Panel members, I'm not going to walk through all of the misstatements of fact but I trust that you've heard the facts and you know them and you will respond to them appropriately." He then addressed the evidence of the bruises CC photographed on her leg and chin on 21 May 2021:

The bruises that you have on her knee and on her chin, on 21 May 2021, all the [D]efense has given you is that the time is wrong; that she was off by a couple of hours of when this might have happened. As she thought it might have been around noon, it turns out it was closer to 1000. What you have not been given is any reasonable explanation for where this came from, what these are about. And specifically what I want you to focus on is the chin because the knee, sure, although you've been given no reasonable explanation, people get bruises on their knees. People fall down and they hit their knee, but what about the chin. Why does she have an injury on her knee and her chin? I really truly challenge you to think about that. Defense hasn't given you any explanation but think about where an explanation might be of how someone might get that. The knee again is common. People might fall to the ground and they might hit their knee on the ground as she did. But what happens after that? You fall on your hands. You don't fall on your chin. How does someone fall on their chin next -- when they've got their hands pulled behind their back. That chin which you have a picture of, and you have the witness [CS] saying she saw it -- 21 May 2021 she came over her house for the first time. She needed to be there. She didn't want to go home. She didn't want to be alone. What does she see? She sees the bruise on her and she hears about the abuse. You

have absolutely no reasonable explanation and no reasonable doubt as to what happened there. What you have is someone who more than a year later was off by a couple of hours of when this happened.

Trial counsel then responded to trial defense counsel's reference to a statement CC made during an interview with trial counsel to the effect that Appellant "took away [her] dream of being a wife and having a family, so it's only fair that now he loses his dream of being a pilot." Trial counsel argued:

> For a woman who has been abused over the course of many months, how is she supposed to feel? How is a victim supposed to feel when she's asked by the Legal Office about what sort of outcome she might want from this. Is she supposed to say no accountability; nothing should happen to him? Those are the words of the victim. Those are the words of someone who has been abused over the course of many months and did lose her marriage because of this, and told countless people that that's why she lost her marriage, because of the abuse. What is the first thing that she tells her parents-in-law? "I feel I need to be completely honest with you about why I left." She had suffered abuse multiple times physically from him. So, yes, he did take away her dreams of becoming a wife and [a] mother and having a family, and yes she does feel hurt, and yes she does want him to be held accountable and you should hold him accountable. The [G]overnment absolutely asks that you believe the victim in this case because you have no reasonable reason not to. You know she's telling the truth. You know her sincerity and you have the evidence to back it up.

Trial defense counsel did not object to any portion of trial counsel's findings argument or rebuttal.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). Under plain error review, the appellant bears the burden to demonstrate error that is clear or obvious and results in material prejudice to his substantial rights. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted).

"[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *United States v. Halpin*, 71 M.J.

477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "[I]t is permissible for trial counsel to comment on the defense's failure to refute government evidence or to support its own claims." *United States v. Paige*, 67 M.J. 442, 448 (C.A.A.F. 2009) (citations omitted). "[T]he Government is permitted to make 'a fair response' to claims made by the defense," even when constitutional rights are at stake. *United States v. Gilley*, 56 M.J. 113, 120 (C.A.A.F. 2001) (citations omitted).

"The Due Process Clause of the Fifth Amendment to the Constitution[8] requires the Government to prove a defendant's guilt beyond a reasonable doubt." *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995) (citing *In re Winship*, 397 U.S. 358, 363–64 (1970)). For trial counsel to suggest the accused has any burden to produce evidence demonstrating his innocence is "an error of constitutional dimension." *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004) (citation omitted).

"'[I]t is . . . improper for a trial counsel to attempt to win favor with the members by maligning defense counsel,' including accusing the defense counsel of fabrication." *Voorhees*, 79 M.J. at 10 (quoting *United States v. Fletcher*, 62 M.J. 175, 181–82 (C.A.A.F. 2005)).

"[I]mproper vouching occurs when the trial counsel 'places the prestige of the [G]overnment behind a witness through personal assurances of the witness's veracity.'" *Fletcher*, 62 M.J. at 180 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). "Bolstering" occurs when trial counsel attempts to improperly enhance his or her own credibility. *See Voorhees*, 79 M.J. at 11.

"[T]rial counsel is also prohibited from injecting into argument irrelevant matters, such as personal opinions and facts not in evidence," with the exception of "contemporary history or matters of common knowledge within the community." *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (citing *Fletcher*, 62 M.J. at 180; *United States v. Kropf*, 39 M.J. 107, 108 (C.M.A. 1994)) (additional citation omitted).

"When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81

---

[8] U.S. CONST. amend. V.

M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). In general, appellate courts "weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184). Where an error is of constitutional dimensions, an appellate court may not affirm the result unless the error was harmless beyond a reasonable doubt. *Mason*, 59 M.J. at 424 (C.A.A.F. 2004). "[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

### 3. Analysis

Appellant contends trial counsel's findings argument and rebuttal were improper in multiple respects. Because trial defense counsel did not object, we review for plain error. *Voorhees*, 79 M.J. at 9. We address each type of error Appellant asserts in turn below.

#### a. Shifting the Burden

Appellant asserts trial counsel improperly shifted the burden to the Defense at three points. We address each below.

First, Appellant cites trial counsel's statement that "[t]here has been no evidence provided that [CC] wasn't" Appellant's spouse. Viewed through the lens of plain error review, we do not find trial counsel was clearly or obviously shifting the burden to the Defense to prove CC was not married to Appellant. Trial counsel immediately followed this statement with the observation that the witnesses "talked about the fact that they were married." In context, trial counsel was observing that there was evidence CC and Appellant were married at the time of the charged offenses, and there was no evidence to the contrary. This was not clearly or obviously outside the bounds of fair commentary on the state of the evidence in relation to the elements. Assuming *arguendo* trial counsel's comment was a clear or obvious error, it was harmless beyond a reasonable doubt. The evidence overwhelmingly indicated CC and Appellant were married, and at no point did the Defense contest that element.

Second, Appellant cites trial counsel's comment during rebuttal, regarding the bruise on CC's chin, that the "Defense hasn't given you any explanation but think about where an explanation might be of how someone might get that." Again, in the context of the argument as quoted above, we are not persuaded trial counsel was clearly or obviously improperly shifting the burden. Rather, trial counsel was specifically responding to trial defense counsel's argument, and more particularly asserting trial defense counsel's inability to

address the evidence of the bruise on CC's chin, which was more unusual than a leg bruise. A comment by trial counsel to the effect that the Defense's argument or theory of the case is weak is not inevitably a burden-shifting comment on the Defense's inability to present better evidence for its case. Trial counsel's argument was based on the purported strength of the Government's evidence, and aimed not at the absence of any particular evidence but at the Defense's argument—that is, "comment[ing] on the [D]efense's failure to refute government evidence or to support its own claims." *Paige*, 67 M.J. at 448 (citations omitted).

Third, Appellant cites several quotes from trial counsel's findings argument and rebuttal which, Appellant contends in his brief, show trial counsel "focused on what the [D]efense *was required to do* in order to *disprove*" the offenses. The cited quotes include: "You have not been provided with any reasonable explanation as to why [D]efense just wants to get up here and say it's a lie, it's a lie, it's all lies;" "The [D]efense needs to get up here and say that all of these people are just lying to you; that it's all one giant conspiracy theory;" "What you have not been given is any reasonable explanation for where this came from, what these [bruises] are about;" and once again, "Defense hasn't given you any explanation but think about where an explanation might be of how someone might get that [bruise on her chin]." However, similar to our analysis above, under plain error review, we are not persuaded trial counsel's argument exceeded the bounds of permissible commentary on the state of the evidence and countering the Defense's argument and theory of the case by anticipating what trial defense counsel would argue in light of the testimony provided. Although perhaps awkwardly worded in places,[9] essentially trial counsel was not arguing the Defense had failed to present any particular evidence, but that trial defense counsel's argument was weak in the face of the credible evidence the Government put on. Accordingly, we find no clear or obvious error.

### b. Improper Bolstering and Vouching

---

[9] We acknowledge trial counsel's use of the phrase "needs to"—viewed in isolation—may appear particularly ill-advised. However, viewed in context, it is neither plain nor obvious trial counsel was shifting the burden of proof; rather, he was anticipating what trial defense counsel's argument would be in light of the evidence before the court members. We again note the absence of a defense objection, which suggests trial defense counsel did not perceive the remark as an improper burden shift. Moreover, the court members received this argument after having been repeatedly advised the burden of proof beyond a reasonable doubt rested with the Government, and in particular, "never shifts to the accused to establish innocence or to disprove the facts necessary to establish each element of each offense."

Appellant contends trial counsel improperly bolstered and vouched for the Government's witnesses, and for CC in particular. He cites trial counsel's statements that "you have a credible witness," that "[CC] was credible," and "she's telling the truth." Appellant compares the instant case to *Voorhees*, where the United States Court of Appeals for the Armed Forces found numerous examples where that trial counsel "improperly expressed his personal opinion about [the a]ppellant's guilt, utilized personal pronouns, bolstered his own credibility, and vouched for government witnesses." 79 M.J. at 11. Again, we are not persuaded Appellant has met his burden to demonstrate clear or obvious error.

With respect to the comparison with *Voorhees*, we first note that the alleged improprieties in Appellant's case are less severe in number, type, and degree than in that case. Unlike *Voorhees*, trial counsel in Appellant's case did not bolster his own personal credibility as an advocate, resort to personal pronouns, or starkly express his personal opinion as to Appellant's guilt. *See id.* at 11–12. It is true that trial counsel's statements that CC was credible resemble certain statements included in passages of argument *Voorhees* described as clear and obvious error, *e.g.*, "that [A]irman is credible," and "[s]he testified credibly." *Id.* at 11. However, trial counsel's argument "must be examined in light of its context within the entire court-martial," *Carter*, 61 M.J. at 33 (citation omitted), and "it is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238. In *Voorhees*, the context was "findings and rebuttal arguments . . . riddled with egregious misconduct," including obvious errors of multiple types. 79 M.J. at 10. In Appellant's case, however, a fair reading is that trial counsel was arguing based on the evidence and fair inferences therefrom, rather than relying on personal assurances or the Government's prestige to sway the court members. *See Halpin*, 71 M.J. at 479 (citation omitted); *Fletcher*, 62 M.J. at 180 (citation omitted). Trial counsel are, of course, not categorically prohibited from arguing that court members should find a victim's testimony credible. *See, e.g., United States v. Blackburn*, No. ACM 40303 (f rev), 2024 CCA LEXIS 129, at *39 (A.F. Ct. Crim. App. 4 Apr. 2024) (unpub. op.) (finding no plain error where trial counsel "argued in general" the child victim was a credible witness in light of the evidence and reasonable inferences therefrom). In Appellant's case, we are not persuaded trial counsel clearly or obviously invited the court members to base their credibility assessment on inappropriate considerations, as opposed to the state of the evidence, reasonable inferences, their own observations of the testimony, and their common sense and knowledge of the ways of the world. *See United States v. Frey*, 73 M.J. 245, 250 (C.A.A.F. 2014) ("[Court] members are expected to use their common sense in assessing the credibility of testimony as well as other evidence presented at trial.").

Assuming *arguendo* trial counsel's statements regarding CC's credibility were improper, applying the three-part harmless-error analysis from *Fletcher* and *Andrews*, we are nevertheless confident the court members convicted Appellant on the basis of the evidence alone. Although it had certain weaknesses, overall the Government's proof supporting the convictions was moderately strong.[10] CC provided clear testimony Appellant committed the charged acts. Her testimony about these two offenses was corroborated to some extent by the testimony of her coworkers who observed suspicious bruises on CC on or near the same dates, testimony from individuals to whom CC had made prior consistent statements implying or asserting that Appellant was abusive toward her, and photographs of the bruises CC took on 21 May 2021.[11] Because there was no objection, and the military judge did not intervene sua sponte, there were no specific corrective measures, although the military judge did provide standard instructions that it was the court members' "duty to determine the believability of the witnesses," taking into account a number of considerations. However, most significantly, we find the severity of the misconduct very low. Appellant cites a very few instances of trial counsel referring to CC as "credible" in a lengthy argument[12] primarily focused on the evidence in the case. Moreover, as stated above, even if we assume trial counsel should have been more careful with his words in light of *Voorhees*, he did not suggest the court members should rely on his own trustworthiness or the prestige of the Government to sway their deliberations.

### c. Arguing Facts Not in Evidence

Appellant contends trial counsel improperly argued facts not in evidence before the court members in three respects.

First, Appellant takes issue with a physical demonstration trial counsel evidently performed during his rebuttal argument while explaining how CC

---

[10] Appellant does not raise legal or factual insufficiency of the evidence in his assignments of error. *See generally United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (setting forth applicable standards for legal and factual sufficiency).

[11] As the Government conceded at trial, the date stamps on the photographs suggest CC was mistaken as to at what point in the day on 21 May 2021 the assault occurred and when she took the photographs. Notwithstanding this discrepancy, the court members could still reasonably find the photographs of the injuries significantly corroborated CC's testimony regarding the 21 May 2021 assault.

[12] Trial counsel's findings and rebuttal arguments together spanned over 24 pages of the written transcript. By comparison, trial defense counsel's findings argument spanned approximately 13 pages.

received the bruise to her chin during the 21 May 2021 incident.[13] According to Appellant's declaration, trial counsel got on his knees and placed his hands behind his back while describing how CC had her "hands pulled behind [her] back." Appellant asserts trial counsel thereby improperly "imposed his personal views and interpretation of the evidence on the members given there was no factual basis for his demonstration in the record," which rendered the demonstration a "hypothetical[ ] with no basis in evidence." *See Norwood*, 81 M.J. at 21 ("Arguing an inflammatory hypothetical scenario with no basis in evidence amounts to improper argument . . . .") (citation omitted)). We are not persuaded. Trial counsel are permitted to argue reasonable inferences from the evidence. *Halpin*, 71 M.J. at 479 (citation omitted). Despite Appellant's assertion to the contrary, based on the description in Appellant's declaration, it does not appear to us trial counsel's physical demonstration was inconsistent with CC's testimony. We find no plain error on this point.

Second, Appellant cites trial counsel's reference to the burden the investigative and prosecution processes would have imposed on CC. He specifically cites the following statements: "It's not for the faint of heart to testify in court;" "it is a long, drawn-out, difficult experience for [CC];" "[w]hat possible motivation does she have;" and "[y]ou saw her and you saw her credibility." Appellant contends "no evidence of the difficulty in testifying nor the investigative process was ever admitted at trial." We are not persuaded these comments amounted to plain error. Although the court members were not presented with specific evidence regarding how difficult CC found the investigation and court-martial process, they did have evidence that approximately one year had elapsed between when CC reported the offenses to law enforcement and Appellant's court-martial, and that she had undergone at least one interview with the prosecutors before trial. Moreover, the court members were aware of the nature of her testimony and able to observe her demeanor on the stand. Court members are routinely advised, "In weighing and evaluating the evidence, [they] are expected to use [their] own common sense and [their] knowledge of human nature and the ways for the world." Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 2-5-12 (29 Feb. 2020). We conclude trial counsel's general statements suggesting that CC's participation in the

---

[13] This court granted a defense motion to attach a declaration by Appellant, dated 17 May 2024, in which Appellant described a physical demonstration trial counsel performed during his rebuttal argument. Courts of Criminal Appeals may "consider affidavits . . . when doing so is necessary for resolving issues raised by materials in the record." *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020). The demonstration Appellant describes is not recorded or described in the record of trial. For purposes of our analysis, we conclude we may consider the declaration consistent with *Jessie*.

investigation and court-martial-imposed burdens on her were not clearly or obviously outside reasonable inferences the court members could draw from the matters before them.

Third, Appellant cites trial counsel's statement that CC reported Appellant's offenses because she was "concern[ed] that he might go out and do this to someone else; that that can happen." Appellant asserts CC "never testified that is why she came forward." However, toward the end of CC's direct examination, trial counsel asked her, "[W]hat happens for you ultimately reporting [sic] this to law enforcement?" CC responded, "I felt as though he used me and I didn't feel like he loved me. *It made me feel like he was going to do this to someone else*." (Emphasis added). Trial defense counsel objected to this testimony, but he was overruled by the military judge. Accordingly, we find this aspect of Appellant's argument is without merit.

### d. Disparaging the Defense

Finally, Appellant cites as error trial counsel's comments to the effect that the Defense was trying to convince the court members of a "conspiracy theory." We acknowledge that, in light of *Voorhees*, accusing opposing counsel of presenting "conspiracy theories" may be ill-advised. *See Voorhees*, 79 M.J. at 10 (holding that "ma[king] the defense theory of the case seem fantastical" was "clear, obvious error"). In light of *Voorhees*, we assume *arguendo* that these comments were clearly erroneous. However, applying the three-part test for harmless error from *Fletcher* and *Andrews*, we are again confident the court members convicted Appellant on the basis of the evidence alone. As stated above, the Government's case supporting the convictions was moderately strong. Without an objection, the military judge did not provide specific corrective measures. However, once again, we find the low severity of the assumed error decides the issue. The comments Appellant cites were confined to a short portion of a lengthy argument primarily focused on the evidence; they were not part of an extended or egregious personal attack on trial defense counsel or Appellant himself. Although poorly chosen, trial counsel's statements may be understood as commentary on the strength of the Government's evidence corroborating CC's testimony, rooted in reasonable inferences from the evidence. We do not find Appellant was unfairly prejudiced.

## B. Lay Witness Testimony Regarding Bruising

### 1. Additional Background

At trial, CC's former co-worker at the department store, SM, testified that in early 2021 she noticed CC came to work with "a few bruises." SM further testified that CC later told her in early June 2021 that Appellant caused those bruises. On cross-examination, trial defense counsel explored, *inter alia*, the

nature of the work CC and SM did together, which included moving and unpacking boxes and sometimes helping to unload trucks.

On redirect examination, trial counsel asked, "Did the bruises that you saw [CC] display appear consistent with the work that you guys were doing?" SM responded, "No, not really." Trial defense counsel did not object to this testimony.

**2. Law**

### a. Admission of Lay Opinion Testimony

We review a military judge's decision to admit evidence for an abuse of discretion. *See United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019) (citation omitted). Where an appellant failed to make a timely objection to the admission of evidence, we review for plain error. *Knapp*, 73 M.J. at 36 (citations omitted). Under plain error review, the appellant bears the burden to demonstrate error that is clear or obvious and results in material prejudice to his substantial rights. *Id.* (citation omitted).

Mil. R. Evid. 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness' perception;
>
> (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Mil. R. Evid. 702 [governing expert testimony].

Thus, "[Mil. R. Evid.] 701 establishes a two-part test for admissibility of lay opinion: (1) the opinion must be rationally based on the witness's perception; and (2) the opinion must be helpful to the determination of a fact in issue." *United States v. Byrd*, 60 M.J. 4, 6 (C.A.A.F. 2004); *accord United States v. Norman*, 74 M.J. 144, 149 (C.A.A.F. 2015) (quoting *Byrd*).

### b. Ineffective Assistance of Counsel

The Sixth Amendment[14] guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124. In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668,

---

[14] U.S. CONST. amend. VI.

687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475. With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

**3. Analysis**

Appellant contends the military judge plainly erred by permitting SM to testify to her opinion that the bruises she observed on CC were "not really" consistent with the type of work CC and SM performed at the department store. In the alternative, Appellant contends he received ineffective assistance of counsel when trial defense counsel failed to object to this testimony. We address each contention in turn.

### a. Admission of Lay Opinion Testimony

We find the military judge did not plainly or obviously abuse his discretion by permitting SM to testify, without objection, that she did not think CC's bruises appeared consistent with the type of work she and CC did together. The military judge could reasonably conclude SM's testimony was rationally based on her perceptions, in light of the fact that SM spent multiple months performing the same type of work CC performed. In addition, SM's testimony was helpful to the court members in determining a fact in issue. SM testified

she saw bruises on CC in early 2021, which tended to corroborate CC's testimony that in January 2021 Appellant bit her on the arm, leaving a bruise that lasted one or two weeks. On cross-examination, trial defense counsel elicited that at work SM and CC moved and unpacked boxes and helped to unload delivery trucks, implying CC may have received bruises while performing her job and suggesting a possible alternative explanation for the bruises SM observed. SM's redirect testimony that the bruises did not appear consistent with their work tended to counter the Defense's suggestion and support the Government's theory that SM saw the bruise CC said she received from Appellant.

Furthermore, we are not persuaded SM's testimony plainly or obviously implicated the sort of scientific, technical, or other specialized knowledge beyond the competence of a lay witness. The military judge could reasonably conclude the receiving of bruises is a sufficiently commonplace aspect of ordinary life that a lay witness could rationally testify, based on her perceptions and experience, whether certain activities she engaged in were or were not likely to cause certain bruises.

Appellant cites this court's opinion in *United States v. Rameshk*, No. ACM 39319, 2018 CCA LEXIS 520 (A.F. Ct. Crim. App. 29 Oct. 2018) (unpub. op.), for the proposition that "testimony about the nature of bruising . . . require[s] specialized knowledge, skill, experience, training or education." In *Rameshk*, the prosecution called as a witness the nurse who treated the rape victim in the case. *Id.* at *13. After the military judge recognized the nurse as an expert in "Emergency Room Nursing," the nurse testified without objection regarding the "lifecycle" of bruises, how their appearance changes over time, and that the bruises on the victim's neck were recent based on their color. *Id.* at *14. On appeal, this court found the military judge did not plainly err by admitting the nurse's testimony regarding the age of the victim's bruises, because the testimony was "an expert opinion based on [her] practical experience in observing and treating bruises and other injuries during her 20-year career as a registered nurse, as well as her personal observation of [the victim] as one of the attending health care providers." *Id.* at *18. *Rameshk* stands for the proposition that "[a] witness may be qualified as an expert not only by reason of 'training or education' but also by 'knowledge, skill, [or] experience.'" *Id.* at *17 (quoting Mil. R. Evid. 702). However, it does not stand for the proposition that *any* testimony regarding the causation of bruises *requires* scientific, technical, or specialized knowledge. Moreover, *Rameshk* is distinguishable in that the specific issue was whether the nurse was qualified to express an opinion regarding the *age* of particular bruises. *Id.* at *16–17. A military judge might reasonably conclude such a determination calls for greater medical expertise, whether derived from education, training, or experience, than a lay person's opinion based

on their own observations and experience whether their job was likely to result in certain observable injuries. In Appellant's case, the military judge did not see the need for further explanation, and we see none.

Accordingly, we find Appellant has failed to demonstrate the military judge committed plain or obvious error by failing to sua sponte exclude or limit SM's testimony.

### b. Failure to Object

Alternatively, Appellant asserts trial defense counsel were ineffective for failing to object to SM's testimony. At the Government's request, this court ordered and received declarations from both of Appellant's trial defense counsel responsive to the allegations of ineffective assistance. In summary, taken together, these declarations make several points regarding SM's testimony. First, trial defense counsel believed SM's testimony was legitimate lay opinion testimony rationally based on SM's perceptions from the work she and CC did together. Second, no court member would have construed SM as offering an improper expert opinion on the matter. Third, trial defense counsel's cross-examination suggesting the possibility CC received the bruises at work opened the door to such a response. Finally, objecting to SM's admissible lay opinion testimony to which the Defense had opened the door would have further drawn the court members' attention to her testimony and would have been counterproductive.

We find Appellant has failed to overcome the presumption of competence. For reasons similar to our analysis concluding the military judge did not commit plain error, we find trial defense counsel's belief that SM's testimony was admissible, and that objecting to it would have been unhelpful, met the applicable standard of reasonable professional assistance. *See Datavs*, 71 M.J. at 424 (citations omitted). Accordingly, Appellant is not entitled to relief.

## C. Mil. R. Evid. 404(b)

### 1. Additional Background

When the Government called A1C AA, the former housemate of Appellant and CC, to testify, the Defense requested a hearing outside the presence of the court members. Trial defense counsel objected to A1C AA testifying regarding "uncharged misconduct in the sense of verbal altercations [between Appellant and CC] when he lived with them." The military judge received argument from counsel on the Defense's objection, in the course of which trial counsel indicated the Government also intended to elicit that Appellant told A1C AA not to talk to CC.

Analyzing the proposed testimony under Mil. R. Evid. 404(b), the military judge ruled the Government could call A1C AA to offer the proffered testimony. First, the military judge found the court members "could reasonably find whatever facts the witness testifies to." Next, the military judge found the proffered testimony would be relevant, explaining "the existence of some sort of animosity or conflict in the marriage would make it more likely that someone might commit an act of violence against another person if they harbor ill will or a[ny] ill feelings against that person because of disagreements about things." Third, the military judge found the probative value was not substantially outweighed by countervailing concerns:

> There has already been evidence elicited regarding arguments or disagreements between [Appellant] and [CC] so I don't think that the members will be confused as to the issues before them or be misled. A single witness's testimony will not cause undue delay or a waste of time. Finally, I don't think there's a danger of unfair prejudice since the existence of conflict between the spouses provide possible explanation or motive for [Appellant] to commit the charged offenses.

A1C AA subsequently testified, *inter alia*, that beginning approximately a week after he moved in with Appellant and CC in October 2020, Appellant and CC seem to argue "nonstop" on a daily basis. From what A1C AA could hear, most of the arguments were about "financial stuff," and Appellant started most of the arguments. In addition, A1C AA testified Appellant told A1C AA to go through Appellant if he needed to talk to CC.

When delivering findings instructions, the military judge advised the court members they could consider A1C AA's testimony that Appellant "may have frequently argued" with CC "for the limited purpose of its tendency, if any, to determine whether [Appellant] had a motive to commit the alleged offenses." He further instructed the court members they "may not consider this evidence for any other purpose and you may not conclude from this evidence that the accused is a bad person or has a bad character and that he therefore committed the offenses charged."

### 2. Law

We review a military judge's ruling pursuant to Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United*

*States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving motive to commit a charged offense. Mil. R. Evid. 404(b)(2). We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (omissions in original) (quoting *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989)). The third prong of the test is essentially an application of Mil. R. Evid. 403. *See Reynolds*, 29 M.J. at 109.

### 3. Analysis

Appellant contends the military judge abused his discretion by permitting A1C AA's testimony because his application of the facts to the law was clearly unreasonable. Appellant argues the evidence that Appellant argued with CC about finances and required A1C AA to communicate with CC through him did not make it more or less likely that Appellant committed the charged assaults. Appellant concedes that "[u]nder the right facts, a contentious marriage might show an accused meant to later abuse his wife . . . ." However, he contends, in this case the charged misconduct did not allegedly arise from arguments over finances, or from Appellant's attempts to restrict CC's contact with other men, but instead from confrontations over Appellant's apparent interest in viewing and communicating with other women. Appellant further argues this evidence "only served to broadly paint Appellant as a bad person."

We conclude the military judge did not abuse his discretion. He appropriately analyzed the proffered testimony under the applicable three-pronged

*Reynolds* test for Mil. R. Evid. 404(b) evidence. As to the first prong, he reasonably concluded the court members could make findings based on A1C AA's testimony; in the event, that testimony closely matched what trial counsel had represented. As to the second prong, the military judge's reasoning that evidence of existing "ill will" or animosity between Appellant and CC made an escalation to physical abuse more likely was not clearly unreasonable. We are not persuaded by Appellant's suggestion that A1C AA's testimony that a "majority" of the arguments he heard were about finances was not relevant if the charged assaults did not originate in disputes over finances. It was not clearly unreasonable for the military judge to find the existence of animosity between Appellant and his spouse, as evidenced by their frequent arguments, regardless of the specific topics, was sufficient to meet the low bar for relevance.[15] *See* Mil. R. Evid. 401 ("Evidence is relevant if [ ] it has *any* tendency to make a fact more or less probable . . . ."); *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (stating the threshold for relevant evidence is "low").

We further find the military judge did not err in finding the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The military judge reasonably explained his conclusion that A1C AA's testimony would not be confusing, misleading, a waste of time, or otherwise unfair to Appellant. *See United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) ("Where a military judge properly conducts the balancing test under Mil. R. Evid. 403, we will not overturn his decision unless there is a clear abuse of discretion."). Moreover, such risks were mitigated by the military judge's instructions that A1C AA's testimony regarding arguments could only be used as evidence of motive, and could not be considered as character or propensity evidence. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citation omitted) (stating court members are presumed to follow the military judge's instructions absent evidence to the contrary).

Accordingly, Appellant has failed to demonstrate the military judge abused his discretion by allowing A1C AA's testimony.

**D. Requested Alibi Instruction**

**1. Additional Background**

With regard to Specification 2 of the Charge, the assault consummated by battery on or about 21 May 2021, CC testified Appellant assaulted her in the

---

[15] Additionally, as the Government notes, the initiation of the 21 May 2021 incident *was* related to finances. CC testified the chain of events began with Appellant using CC's phone and CC's account to order supplies for his business without her permission, leading her to pick up Appellant's phone.

afternoon before she departed for work at approximately 1400. On cross-examination, CC agreed that there was a point in time where Appellant worked on swing shifts, which began at 1500; on those days, Appellant typically went to sleep around 0500 or 0600 and "most of the time" awoke around 1400 before going to work. As described above, the photographs CC took of her leg and chin bruises on 21 May 2021 have time stamps indicating 1058 and 1104. The Defense introduced evidence through Appellant's former supervisor that Appellant worked a swing shift beginning at 1500 on 21 May 2021.

At trial, the Defense requested the military judge instruct the court members on the defense of alibi with respect to Specification 2. The Defense's proposed instruction stated:

> The evidence has raised the defense of alibi in relation to the offense of assault against a spouse as alleged in Specification 2 . . . . "Alibi" means that the accused could not have committed the offense charged because the accused was at another place when the offense occurred. Alibi is a complete defense to the offense of assault against a spouse. In this regard, there has been evidence that [CC] was assaulted in the afternoon of 21 May 2021, before her work shift started at 3pm. There has also been evidence that [Appellant] worked an afternoon shift that started at 3pm, he was present at work on 21 May 2021, he had a 15[-] minute drive to work, and he routinely slept until 2pm when he worked the afternoon shifts.

> The burden is on the prosecution to establish the guilt of the accused. If you are convinced beyond a reasonable doubt that the accused was present at the time and place of the alleged offense, then the defense of alibi does not exist.

The military judge denied the requested alibi instruction in an oral ruling. He explained, *inter alia*, "just based on the timelines of the evidence there does not seem to be raised evidence that due to [Appellant's] work shift beginning at 1500 that he was not present at the time alleged which was sometime earlier in the afternoon."

### 2. Law

We review the adequacy of a military judge's instructions de novo. *See United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006) (citations omitted).

> Alibi -- which in Latin means "elsewhere" -- is a term applied to an accused's claim that he was at another place when the crime was committed. By introducing evidence that he was elsewhere

> at the time, the accused provides a foundation for the inference
> that he could not have committed the crime. Although alibi is
> not an affirmative defense -- which excuses, justifies, or miti-
> gates an accused's action -- it is well settled that, if the issue is
> raised, a requested instruction on alibi should be given.

*United States v. Brooks*, 25 M.J. 175, 178 (C.M.A. 1987) (citations omitted). "In determining whether to grant a requested instruction on alibi, the judge must not weigh the credibility of the alibi evidence." *Id.*

"[A]ny party may request that the military judge instruct the members on the law as set forth in the request." R.C.M. 920(c). However, the military judge has substantial discretionary power in deciding what non-required instructions to give. *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993) (citing R.C.M. 920(c), Discussion; *United States v. Smith*, 34 M.J. 200 (C.M.A. 1992)). Denial of a defense-requested instruction is reviewed for abuse of discretion. *United States v. Carruthers*, 64 M.J. 340, 345–46 (C.A.A.F. 2007) (citations omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *Ellis*, 68 M.J. at 344 (citation omitted). We apply a three-part test to evaluate whether the failure to give a requested instruction is error: "(1) [the requested instruction] is correct; (2) it is not substantially covered in the main [instruction]; and (3) it is on such a vital point in the case that the failure to give it deprived [an appellant] of a defense or seriously impaired its effective presentation." *Carruthers*, 64 M.J. at 346 (first and second alteration in original) (quoting *United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003)). All three prongs of the test must be satisfied in order to find error. *United States v. Barnett*, 71 M.J. 248, 253 (C.A.A.F. 2012).

### 3. Analysis

Appellant contends the military judge erred because an alibi instruction "with modifications" was "clearly raised by the evidence and would have been correct." Appellant argues the evidence shows Appellant worked a swing shift on 21 May 2021, and would "usually" have awoken around 1400—the same time CC would have departed for her own job. Therefore, while Appellant may have been at home before work on 21 May 2021, he asserts, the evidence indicates CC "was not at the time or place alleged for this injury to have occurred as she testified and as the Government charged." Appellant concludes,

> The defense of alibi was not covered by any standard instruction.
> At the very least, a tailored instruction here—that the time and

place alleged by the Government established that [CC] was not present, and thus, Appellant could not have caused the injury as charged—was warranted by the evidence and not otherwise instructed.

We agree with the military judge that the evidence did not raise the defense of alibi. The evidence indicates CC and Appellant were both present at their shared residence before CC departed for work at approximately 1400. Evidence that "most of the time" Appellant slept until approximately 1400 when he worked swing shifts is not evidence that he was "elsewhere" on 21 May 2021. Trial defense counsel could argue this evidence called into question CC's version of events; but that does not make it evidence of an alibi.

We have also considered whether the military judge abused his discretion by failing to give the requested instruction, even if it was not required by the evidence. Applying the three-part test set forth in *Carruthers* and *Gibson*, we find he did not. With respect to the first prong, the requested instruction was not "correct" in that the evidence did not raise the defense of alibi. With respect to the third prong, the instruction was not on such a "vital point in the case that the failure to give it deprived [Appellant] of a defense or seriously impaired its effective presentation." *Carruthers*, 64 M.J. at 346. Trial defense counsel was free to argue that the evidence regarding Appellant's and CC's sleep and work schedules tended to make it less likely that events transpired as CC testified, and thereby undermined the reliability of her testimony with regard to Specification 2, with or without an instruction to that effect.

## E. Ineffective Assistance of Counsel

Appellant personally asserts he received ineffective assistance of counsel due to trial defense counsel's failure to "seek expert witness assistance in analyzing the bruising on [CC's] forearm due to a bite and the photographic evidence of the bruising to [CC's] chin and knee, documented in Prosecution Exhibit 1." Appellant contends this failure was unreasonable because the absence of expert assistance

> left several areas unaddressed or inadequately explained at trial: (1) whether the bruises in Prosecution Exhibit 1 were consistent with the injury described by [CC], which was the corroboration for the charged encompassed by [S]pecification 2, (2) whether the bruises depicted in Prosecution Exhibit 1 were consistent with the charged timeframe in [S]pecification 2 and the date and time the photograph was taken, and (3) whether the bite as described for [S]pecification 3 would cause a bruise, or a

bruise that would last for two weeks but not break the skin or otherwise required no treatment.

Appellant contends such assistance would have likely produced a more favorable result, noting Appellant was convicted of the two specifications for which the Government introduced corroborating evidence of the bruises CC claimed to have received, and acquitted of the two specifications for which there was not such evidence.

At the Government's request, this court ordered and received declarations from both of Appellant's trial defense counsel responsive to the allegations of ineffective assistance. With respect to expert assistance as to evidence of bruising, trial defense counsel explained that based on their experience they did not believe such expert advice would assist the Defense's case. Because CC did not seek medical treatment for the bruises, the only evidence available for such an expert to analyze were the low-quality photographs CC took of the bruises on her leg and chin. With such limited information, trial defense counsel did not believe a medical expert would be able to determine the age or cause of the bruises, and would not be able to rule out domestic abuse as the cause. Instead, trial defense counsel elected to focus on what they identified as CC's motives to fabricate the allegations and inaccuracies or inconsistencies in her description of events.

The standard of review and burdens applicable to claims of ineffective assistance of counsel are set forth in relation to issue (2), *supra*. The burden is on an appellant to demonstrate both deficient performance and prejudice. *Datavs*, 71 M.J. at 424 (citation omitted). Appellant fails to carry either burden. We agree with Appellant that the evidence of bruising may have played a significant part in the findings of guilty. However, Appellant fails to identify what a qualified expert would have advised or testified to with regard the evidence of bruising in this case, much less how it would have undermined the Government's case or assisted the Defense's case. Therefore, Appellant fails to demonstrate that trial defense counsel's assessment was unreasonable or their performance was deficient, or that obtaining such assistance offered a reasonable probability of a more favorable result. *See id.*

**F. Appellate Delay**

Appellant's record of trial was originally docketed with this court on 15 August 2023. Appellant requested and was granted four enlargements of time to file his assignments of error, over the Government's opposition, before filing

his brief on 28 May 2024. Over Appellant's opposition,[16] the Government was granted an enlargement of time in order to obtain declarations from trial defense counsel responsive to Appellant's claims of ineffective assistance of counsel. The Government timely filed its answer brief on 4 August 2024.[17] Appellant filed a reply brief on 11 August 2024.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." 63 M.J. at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Id.* at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno*, there is a facially unreasonable delay, although we note the 18-month threshold has been exceeded by less than one month. Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we do not find any. With regard to oppressive incarceration, based on the adjudged term of confinement, at the latest, Appellant was due to be released from confinement shortly after his case

---

[16] Appellant's opposition included an assertion of "his right to speedy appellate review."

[17] On 22 August 2024, the Government moved to file an amended answer brief; this court granted the motion on 4 September 2024.

was originally docketed with this court. In addition, we do not perceive any particularized anxiety or concern, nor any particular reason why Appellant's defense at a sentence rehearing or future appeal might be impaired due to the delay.

Absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. The appellate delay was partly occasioned by Appellant's own requests for enlargements of time, and partly by the Government's request for an enlargement occasioned by the need to carefully assess Appellant's claim on appeal of ineffective assistance by his counsel at trial. In addition, Appellant's claim of prosecutorial misconduct required detailed analysis by the court and resulted in a lengthy dissenting opinion. Accordingly, we find no egregious delay and no violation of Appellant's due process rights. Furthermore, recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), we conclude no such relief is warranted.

### III. CONCLUSION

As entered, the findings are correct in law, and the sentence is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d); *see* National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(b)(1)(A), 134 Stat. 3388, 3611–12 (2021). Accordingly, the findings and sentence are **AFFIRMED**.

GRUEN, Judge (dissenting):

I generally concur with my esteemed colleagues as to the majority opinion with the exception of their opinion addressing issue (1). I find trial counsel engaged in prosecutorial misconduct amounting to plain error which resulted in prejudice to Appellant. Further, I find trial counsel improperly implicated Appellant's constitutional rights and the Government failed to meet their burden on appeal to show such error was harmless beyond a reasonable doubt. Therefore, I respectfully dissent as to issue (1) and would SET ASIDE the findings and sentence and return the record of trial to The Judge Advocate General of the Air Force authorizing a rehearing.

## I. BACKGROUND

Specifications 2 and 3 of the Charge for which Appellant was convicted are based on allegations of assault made by Appellant's wife, CC, which she claimed occurred at or near their home in Surprise, Arizona, while Appellant was stationed at Luke Air Force Base. The conduct charged in Specification 3 allegedly occurred sometime in mid-January 2021. The conduct charged in Specification 2 allegedly occurred on or about 21 May 2021.

According to testimony at Appellant's court-martial, Appellant met CC in December 2019 through mutual church friends in Missouri. Appellant was 23 years old and CC was 22 years old. Appellant entered active duty on 10 March 2020. He married CC in June 2020 by virtual ceremony while at technical school. In August 2020, they moved in together for the first time. At the onset of their married life, Appellant and CC had a roommate, AA, to help with finances. AA lived with them from approximately September/October 2020 through January 2021.

While the majority provides a thorough factual background of the case, I believe it necessary to provide additional facts presented from Appellant's record of trial. Specifically, I think it is important to highlight CC's testimony in relation to other witness testimonies. Further, there were several references throughout CC's testimony that would suggest a bias as to why she would allege the offenses against Appellant.

### A. Specification 3 (Unlawful Biting of CC)

With respect to Specification 3, CC testified Appellant assaulted her in mid-January 2021, by biting her arm and leaving a bite-mark bruise. Allegedly, the altercation leading to this assault started because Appellant commented on the large breasts of another woman he saw on television, leading to Appellant biting CC on the arm and CC testifying that the bite resulted in a bruise visible for one or two weeks. CC was confident this bite and bruising occurred in mid-January 2021, because it happened just before her birthday and sister's visit on approximately 17 January 2021. This alleged conduct of Appellant biting CC formed the basis for Specification 3 occurring sometime during January 2021.

However, five other witnesses testified to the offense regarding Appellant biting CC. Four of these witnesses likely personally observed CC during mid-

January 2021.[1] Each was asked whether they observed bruising on CC's arm. RL and CW, who were both neighbors of Appellant and CC, testified they saw CC regularly in January 2021 but did not witness any arguments between CC and Appellant or any injury to CC. Another witness, AA, testified he lived with CC and Appellant during the charged timeframe, but he never saw a bite mark or any bruising on CC, nor did he witness any physical altercations. CC's sister testified she visited CC and Appellant four days in mid-January 2021 but observed no bruises or bite marks on CC, and while CC and her sister are very close, CC did not tell her sister Appellant had bitten her or had physically assaulted her in any way.

The fifth witness, SM, testified she worked with CC in a backroom warehouse-type job at a retail store from November 2020 to mid-January 2021. According to SM, their work included moving, packing, and putting boxes on pallets as well as unloading trucks when needed. SM testified CC came in with "a few bruises" during the time they worked together but she could not provide a specific date to correlate any bruises to the timeframe for the alleged crime. According to SM, CC specifically denied any abuse by Appellant. While SM testified she periodically saw bruises on CC's arms, she did not describe seeing any bite mark. SM did not say at any time CC pulled up her sleeve to show her specific bruises.

CC's allegation that Appellant bit CC and caused bruising during January 2021 is not corroborated by any witness. There was no other evidence offered to corroborate CC's testimony relating to Specification 3.

**B. Specification 2 (Unlawful Pressing of Knee into CC's Back)**

CC testified the offense alleged in Specification 2 occurred just before she left for work at approximately 1400 hours on 21 May 2021. Appellant worked a swing shift on 21 May 2021, from 1500 hours to approximately 2300 hours. CC testified when Appellant worked a swing shift, he would regularly sleep until approximately 1400 hours and leave their home to go to work at approximately 1430 hours. According to CC, just prior to her leaving for work, Appellant and CC argued because Appellant took CC's phone to purchase items via an online retailer account for his car detailing business. She further testified she tried to take her phone back from him because she wanted Appellant to use his own money to buy such items. According to CC, when she tried to grab her phone, Appellant ran to the garage preventing her from retrieving it.

---

[1] SM testified she last saw CC mid-January, so it is unclear if she would have had an opportunity to see her arm at work with a bruise in the time frame with which CC testified she was bitten and developed a bruise.

Choosing not to pursue Appellant, CC then accessed Appellant's phone, which was left in the house, and went through his social media accounts. She discovered Appellant had added a woman to one of his accounts who had sent a post of herself dressed in lingerie. When Appellant returned from the garage, CC started an argument with Appellant over this woman's post. According to CC, Appellant escalated the verbal argument into a physical altercation.

According to CC, while sitting on a bar stool behind the kitchen island counter, Appellant grabbed her wrists, lifted them up, and then lifted her arms to raise her off the bar stool. CC stated she tried to kick Appellant causing him to lift her arms higher. According to CC, this caused her to lose her balance and fall onto the wooden floor reddening her left knee and bruising her chin. Appellant then unlawfully put his knee on her back in between her shoulder blades, which was very painful. CC stated she immediately left for work after this incident. This conduct formed the basis for Specification 3 on or about 21 May 2021.

As to this incident, several witnesses were questioned whether they observed evidence of CC's purported injuries relating to Specification 3. CS, who was a co-worker of CC's during the charged timeframe, testified she saw a bruise on CC's chin between April and June 2021. Again, Appellant and CC's neighbors, RL and CW, who were neighbors who knew both Appellant and CC—CW being a neighbor who saw CC regularly and who had visited with her at both residences—testified they never saw any bruising on CC, abuse of CC by Appellant, nor heard any fights or arguments between the two at any time. CC never reported to either of them any problems she might have been having with Appellant.

Like Specification 3, discussed *supra*, CC's allegation that Appellant unlawfully pressed his knee on CC's back on or about 21 May 2021 is not corroborated by any witness but for CS who did not know when between April and June 2021 she might have seen a bruise on CC's chin or where the bruise came from.

To corroborate CC's testimony that she was injured as a result of Appellant pressing his knee against CC's back, photographs were admitted at trial, found at Prosecution Exhibit 1 and Defense Exhibit A. CC claimed the alleged injuries from falling on her left knee and chin are depicted in these exhibits. However, looking at the images one finds they are grainy and difficult to identify as corroborating evidence of the red knee or bruised chin CC described. Defense Exhibit A shows the clearest picture of CC's chin and neck and depicted no visible bruise.

CC testified she took the photos in the exhibits after returning home from work at approximately 2200 hours on 21 May 2021. The time stamps on the images show, however, that they were actually taken at "10:58" and "11:04" hours on the morning of 21 May 2021, therefore indicating that the alleged incident would have occurred when Appellant was sleeping before his night shift.[2] The images in Defense Exhibit A are clearer, but equally difficult to analyze as evidence of the bruising CC claimed occurred. Interestingly, CS, CC's co-worker, was not shown Prosecution Exhibit 1 or Defense Exhibit A, nor asked to compare what she claimed she saw on CC's chin with the photos in the exhibits. Notably, no expert was called to testify as to the origin or age of any reddening or bruising or to analyze or connect the images to the conduct alleged to have caused any marks that might have existed on CC's body.

## C. CC's Motives

Furthermore, in CC's testimony, she admitted to biases as to why she would allege the offenses against Appellant—she wanted him to lose his ability to become an Air Force pilot. She further testified to becoming increasingly frustrated that her complaining to Appellant regarding his predilections towards interacting with women on adult websites was having no effect on his conduct. Moreover, testimony by CC and her sister made clear Appellant's actions in engaging women online was not a sufficient basis for divorce given CC and her family's religious beliefs—but physical abuse was one of few legitimate reasons to leave your spouse and divorce—this being another motive for CC to fabricate allegations of physical abuse after she finally decided to divorce Appellant.

## II. DISCUSSION

### A. Prosecutorial Misconduct

Appellant set forth multiple theories of alleged prosecutorial misconduct by trial counsel which my colleagues addressed separately and which I will also address in turn. As indicated, *supra*, Appellant claims trial counsel, during findings arguments, (1) improperly shifted the burden of proof, (2) improperly interjected trial counsel's personal beliefs, (3) improperly vouched for witness testimony and evidence, (4) maligned the defense case, and (5) improperly used facts not in evidence. I concur with Appellant that trial counsel made several

---

[2] CC testified her phone was on a 24-hour clock and the times shown on the exhibit indicated "10:58" and "11:04" were on the morning of 21 May 2021.

improper arguments that touched on all of these raised claims and materially prejudiced Appellant.

### 1. Law

A prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (quoting *United States v. Berger*, 295 U.S. 78, 88 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citation omitted).

In arguments to the court members, "trial counsel may argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence[.]" *United States v. Hasan*, 84 M.J. 181, 220 (C.A.A.F. 2024) (internal quotations and citation omitted). "He may not, however, inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted).

It is improper for trial counsel to suggest to the court members that the accused has a burden to establish his or her own innocence. *See United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004) (finding trial counsel's question to expert witness about whether either party had requested a DNA retest improperly shifted the burden of proof to the defense but was harmless beyond reasonable doubt in cases involving overwhelming evidence of accused's guilt). Such an error offends due process by violating the core legal standard of criminal proceedings that the Government always bears the burden of proof to produce evidence on every element of the charged offenses and to persuade the members of the accused's guilt beyond a reasonable doubt. *See United States v. Czekala*, 42 M.J. 168, 170–71 (C.A.A.F. 1995). This court has previously found it improper "for . . . trial counsel to make comments suggesting [an accused] had a duty to offer evidence to prove his innocence," and, furthermore, for a military judge to fail "to sua sponte instruct the court members that [an accused] had no duty to call witnesses or put on evidence." *United States v. Crosser*, No. ACM 35590, 2005 CCA LEXIS 412, at *14 (A.F. Ct. Crim. App. 23 Dec. 2005) (unpub. op.).

Trial counsel may not offer his or her personal opinions about the evidence or the accused's guilt. *Sewell*, 76 M.J. at 18. "This is a dangerous practice because when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore his opinion, even if

biased and baseless . . . in fact[.]" *Fletcher*, 62 M.J. at 180 (citing *United States v. Modica*, 663 F. 2d 1173, 1178 (2d Cir. 1981)).

Furthermore, a trial counsel's "personal views of a defendant's guilt or innocence . . . may confuse the jurors and lead them to believe that the issue is whether or not the prosecutor is truthful instead of whether the evidence is to be believed." *Id*. at 181 (citing *Modica*, 663 F.2d at 1181). "Such tactics are not to be condoned. They tilt the scales of justice, risk prejudicing the defendant, and carry the potential for distracting the jury from its assigned task of assessing the credibility based solely on the evidence presented at trial and the demeanor of the witnesses." *Id*. (quoting *United States v. Perez–Ruiz*, 353 F.3d 1, 9–10 (1st Cir. 2003)).

Trial counsel is also forbidden from improperly vouching for the credibility of witnesses. This occurs when an attorney "plac[es] the prestige of the government behind a witness through personal assurances of the witness's veracity." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

Our superior court has determined "[i]mproper vouching can include the use of personal pronouns in connection with assertions that a witness was correct or to be believed." *Fletcher* 62 M.J. at 180 (C.A.A.F. 2005) (citing *United States v. Washington*, 263 F. Supp. 2d 413, 431 (D. Conn. 2003)). In particular, "[p]rohibited language includes 'I think it is clear,' 'I'm telling you,' and 'I have no doubt.'" *Id*.

It is also "improper for a trial counsel to attempt to win favor with the members by maligning defense counsel." *Fletcher,* 62 M.J. at 181 (citing *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001)). Doing so detracts from the dignity of the proceedings and has the potential to turn the court-martial into a "popularity contest" with the members deciding the case, not on the facts and the law, but "based on which lawyer they like better." *Id*. (citation omitted). In addition, "[d]isparaging remarks that suggest that defense counsel has lied to or withheld information from the jury can further prejudice [an accused] by causing the jury to believe that the defense's characterization of the evidence should not be trusted and, therefore, that a finding of not guilty would be in conflict with the true facts of the case." *Xiong*, 262 F.3d at 675.

In *Fletcher*, the CAAF found error where trial counsel described the defense with words like "nonsense," "fiction," "unbelievable," "ridiculous," and "phony." 62 M.J. at 180. Such comments could be perceived as putting the weight of the Government behind the statements with the result that the testimony or evidence in question appears stronger than it really is. *Id*. (citing *Berger*, 295 U.S. at 88).

Counsel for the Government is free to argue the evidence in the court-martial record and reasonable inferences flowing from such evidence. *Hasan*, 84 M.J. at 220. However, trial counsel is prohibited from referring to facts not in evidence, especially when the remarks are "aimed directly" at the accused's defense, as opposed to "extraneous commentary." *Fletcher*, 62 M.J. at 185.

Ordinarily, "[w]e [as an appellate court] review prosecutorial misconduct and improper argument de novo[.]" *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citations omitted). When no objection is made at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citations omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179).

If we find a prosecutor's argument "amounted to . . . obvious error," we then determine "whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (internal quotations marks and citations omitted). In a plain error analysis, the most straightforward way of resolving an allegation of prosecutorial misconduct may be to do so based on prejudice. *United States v. Palacios Cueto,* 82 M.J. 323, 335 (C.A.A.F. 2022) (citation omitted).

"In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Fletcher* 62 M.J. at 184 (C.A.A.F. 2005) (citation omitted). *Fletcher* set out three factors to weigh in determining the prejudicial effect of improper argument: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* "In other words, prosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

We apply a heightened standard to our review of prosecutorial misconduct implicating an accused's constitutional rights. In particular, a trial counsel's suggestion that an accused may have an obligation to produce evidence of his or her own innocence is constitutional error. When such error occurs, the Government has the burden on appeal to show such error was harmless beyond a reasonable doubt. *Mason*, 59 M.J. at 424.

The test for determining if the error was harmless beyond a reasonable doubt is "whether, beyond a reasonable doubt, the error did not contribute to the [accused's] conviction or sentence." *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020) (quoting *United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F.

2016)). When an appellate court is not confident that a constitutional error did not taint the proceedings, it should find prejudice. *See id.* at 29.

### 2. Analysis

In determining Appellant failed to meet his burden to demonstrate prosecutorial misconduct, my esteemed colleagues rely heavily on *Voorhees*. They were correct in stating that "in *Voorhees*, the context was findings and rebuttal arguments . . . riddled with egregious misconduct, including obvious errors of multiple types." 79 M.J. at 10. Where I cannot agree with their analysis is in their position that this case is not exactly that—one where the findings and rebuttal arguments were riddled with egregious misconduct, including obvious errors of multiple types. Additionally, they rely too heavily on *Voorhees* as the extreme egregiousness of the conduct exhibited by trial counsel in that case should be seen as exactly that—extreme. *Voorhees* should not set the bar such that if counsel do not act as egregiously as trial counsel in that case, then it is not considered clear or obvious error. Our superior court has made that point with their opinion in *Fletcher* and other precedented cases which I have cited throughout this dissent, finding error when conduct was much less egregious than that of trial counsel in *Voorhees*.

My esteemed colleagues rely on two additional points with which I do not agree are their view that trial counsel's closing and rebuttal arguments were "lengthy" and that the evidence put on by the Government was even "moderately strong." Trial on the merits lasted one day and trial counsel's findings and rebuttal arguments were brief—a total of approximately 40 minutes—from the beginning of closing through to his very last words of the rebuttal argument.[3] Nevertheless, within this time frame, trial counsel rarely argued evidence, spent an enormous amount of time describing Appellant and CC's marriage, repeated the elements of the offenses, emphasized what the military judge would be instructing the members on, and repeatedly intermingled improper arguments in his effort to persuade the members to convict Appellant of all specifications in a case with minimal, low-quality evidence of guilt. The lack of evidence is discussed further *infra*.

Trial counsel's general theme was that Appellant would become upset and get physical when he felt he could not control CC. This theory significantly lacked evidentiary support yet, in denying Appellant relief on the prosecutorial misconduct issue, my esteemed colleagues find there was support for this theory citing a long paragraph of trial counsel's argument before which they stated, "[T]rial counsel then reviewed the evidence at some length." This

---

[3] This did not include trial defense counsel's closing argument.

portion of trial counsel's argument was then used to justify the majority position that trial counsel did not shift the burden because he was merely responding to the defense theory in a case with "moderately strong" evidence. The problem is trial counsel's long recitation of "evidence" used by my esteemed colleagues was devoid of evidence. In this recitation, trial counsel argued improperly about the credibility of their primary witness, argued what this case *was not* about, complained about what defense counsel had not provided the panel in the way of evidence, vouched for CC when arguing at length that the trial was inevitably difficult for her, discussed why she would not lie, and insisted the defense case was all lies and conspiracy theories. This display of improper argument was in an attempt to gain a conviction in a case lacking evidentiary support, and culminated in trial counsel arguing, "Members, you absolutely should be firmly convinced that you know what's happened here, that this is the case of a woman who has endured multiple abuses, physical control from her husband, and he absolutely must be held accountable for what he's done." I submit that not only was the evidence scant to non-existent to support such a theory, but the evidence actually showed that it was CC who became upset and abusive when she could not control Appellant.

Shortly after Appellant and CC married, while on their honeymoon, CC engaged Appellant about his interacting with women online and she wanted him to delete the electronic applications (apps) with which he accessed these women. Appellant refused to do so but told CC she could if she wanted to—a clear indication he did not care if she knew how many or what type of women he was engaging—a point of contention for CC. CC testified that she did go on his phone to make deletions and "there was a lot [of women] so it took [her] a long time." In December 2020, after again finding women on his apps, just two months after they had moved in together, CC contacted Appellant via Facebook messenger regarding what she found. Looking at Defense Exhibits C and D, text messages between CC and Appellant, we see CC admits she feels "really insecure about their relationship." Specifically, in Defense Exhibit D, CC confronted Appellant via messenger with some photos of women on his social media. In response, he sent a meme of the Sesame Street character Elmo with his head cocked sideways. CC's response was, "That's all you have to say," to which Appellant replied "[O]ops." CC then responded, "No f[**]k you." She then texted, "We'll talk about this later I'm going to bed," to which Appellant responded with another meme that read, "Bye Bye." When CC was not receiving the responses from Appellant she believed she deserved she texted him, "You're an immature piece of s[**]t." Appellant then went offline. This is documentary evidence of how Appellant and CC interacted when she became upset about Appellant's engaging women online—she became verbally assaultive, and he retreated. This is in stark contrast to CC's testimony with which trial counsel

vouched strenuously during his closing and rebuttal arguments as being "true."

At another point in CC's testimony, she stated that towards the end of their relationship, she told Appellant if he would apologize, she would stay with him; he did not apologize and seemingly did not care if she left their marriage. Defense Exhibit C is a text message between CC and Appellant on 25 April 2021, wherein she apologized to him and explained she did not want to get a divorce. It is a lengthy text where she explains that she does not feel Appellant finds her attractive because they "don't have sex and [she does not] feel like [Appellant] compliment[s] [her] unless [she] ask[s]." She further states she loves Appellant and wants their "relationship to work" and wants them to "grow together." She confides in Appellant that she feels "really insecure about [their] relationship when [he] look[s] at other women." Nowhere in this text from late April 2021 did CC complain about physical conduct towards her by Appellant. The text messages between CC and her father-in-law focused significantly on the basis of her grief and anger being the fact she could not make Appellant stop interacting with women online. She only alleged Appellant had "physically harmed" her after her father-in-law humiliated her regarding her complaints to him about Appellant's online conduct. Moreover, these conversations happened on 15 June 2021, well after CC left Appellant and divorce was imminent. CC's testimony was weak and unsupported and required trial counsel to make improper arguments in order to secure a conviction.

### a. Burden Shifting – Constitutional Error

In this case we must apply a heightened standard to our review of prosecutorial misconduct because in addition to other methods of misconduct employed by trial counsel during his arguments, he at the very least suggested that Appellant may have an obligation to produce evidence of his own innocence, which shifted the burden of proof, implicating Appellant's constitutional rights. Thus, on this issue the Government has the burden to now show on appeal such error was harmless beyond a reasonable doubt. The majority opinion seemingly did not hold the Government to this heightened standard stating "we do not find trial counsel was clearly or obviously shifting the burden to the Defense," rather than explaining how the portions of the argument in issue did not even *suggest* an obligation on behalf of Appellant. I analyze below why the statements by trial counsel did indeed, at the very least, suggest Appellant had an obligation to produce evidence. I therefore submit my esteemed colleagues were required to apply this same heightened standard and state how the errors Appellant complains of did not amount to constitutional error, contribute to his conviction and sentence, or taint the proceedings prejudicing Appellant.

With respect to specific statements that shifted the burden of proof to Appellant, when discussing Specification 2 (pressing his knee on CC) in his rebuttal argument, trial counsel responded to trial defense counsel's point during closing argument that the timestamps on the pictures that purported to show bruising on the chin and a red knee, were inconsistent with CC's testimony. Specifically, CC's testimony about the time she allegedly received her purported injuries and her testimony regarding when she photographed the alleged injuries were inconsistent with the timestamps on the exhibits. Trial defense counsel's point was that these pictures do not corroborate CC's testimony, but conversely, they prove her version of events could not have occurred as she testified. Trial counsel argued the members should not put much weight behind trial defense counsel's point about the timing because "you have not been given [ ] any reasonable explanation for where this [the alleged injuries] came from, what these are about." Trial counsel pressed this position further when he argued, "[S]pecifically[,] what I want you to focus on is the chin . . . although you've been given no reasonable explanation . . . why does she have an injury to her knee and her chin? I really truly challenge you to think about that. *Defense hasn't given you any explanation.*" (Emphasis added).

Yet these were not the only burden-shifting statements made by trial counsel. When discussing CC's overall credibility, he also engaged in improper burden shifting when he stated, "*You have not been provided with* any real reason to doubt the credibility of this witness. She's telling the truth. What does she have to gain by not telling the truth?" (Emphasis added). Thereafter, trial counsel again stated, "*You have not been provided with* any reasonable explanation as to why defense just wants to get up here and say it's a lie, it's a lie, it's all lies[.]" (Emphasis added). At another point, trial counsel stated, "*The defense needs to get up here and say* that all of these people are just lying to you; that it's all one giant conspiracy theory. None of it makes sense." (Emphasis added). While I address improper burden shifting in this section, it is notable that trial counsel interwove other improper arguments, which I will discuss in more detail *infra,* such as improper vouching, maligning the defense case, and improperly asserting that there was no reason to doubt CC's credibility when trial counsel knew there were at least three theories elicited from the evidence at trial to support the possibility that CC fabricated the alleged assaults.

My esteemed colleagues base their findings on their position that there was no burden shifting because "[t]rial counsel's argument was based on the purported strength of the Government's evidence and aimed not at the absence of any particular evidence but at the Defense's argument," with which I am also not inclined to agree. In fact, the majority tries to gloss over the constitutional

error by describing trial counsel's argument as merely being "awkwardly worded in places." First, trial defense counsel had not yet made their argument when trial counsel set to shifting the burden and planting in the minds of the members that Appellant had any burden in the trial. Second, this case had none of the hallmarks of a strong evidentiary case. There was no admission by Appellant, medical records of injuries, DNA, CCTV, pretext phone call or text or email evidence between Appellant and CC supporting CC's claims. CC's co-worker's witness testimony was weak and on many salient points added little to nothing to corroborate CC's claims of assault.

With respect to the alleged bite, SM's testimony was the only evidence provided to corroborate CC's testimony and in reality, was no corroboration at all. As for documentary evidence, the photos purporting to support the 21 May 2021 alleged assault were grainy and it was impossible to know what "shading" shown on the photo was supposed to be a chin bruise. The photo in the record purporting to show a chin bruise had "shading" all down CC's neck starting under the chin. There was no testimony that this was the extent of the "chin bruise" and it is unlikely if this was extensive bruising that it would result from the events to which CC testified. It is also unlikely it would go unnoticed by the neighbors or others with whom she came into contact. Moreover, it begs the question as to why trial counsel did not show CS the photos when she testified and question her as to whether the photo was consistent with any chin bruise she might have seen—CS being the only potential corroborating witness to the alleged chin bruise since the two neighbors who also saw CC regularly in that time period said they witnessed no bruises. Defense Exhibit A is a photo of CC's chin, which looks to have been taken on 21 May 2021 at either 1104 or 1146 hours—it shows no signs of a bruise.

CS's and SM's testimonies purporting to corroborate CC's testimony were weak given her co-workers could not identify specific dates of when they may have seen a bruise on her, they were not shown the picture purporting to show a chin bruise to CS for comparison with what she saw, nobody saw a bite bruise, the timing of incidents did not match other evidence, and much of what CC said herself was proven to be inconsistent with other evidence or simply inaccurate. Couple this with AA's and CC's sister's testimonies that even while staying in the home in mid-January 2021 during the time CC alleged Appellant bit her, she did not tell anyone of the bite, and nobody saw a bite bruise. In my estimation the evidence at trial was very weak and, in many respects, negated CC's testimony, and I find it was improper for trial counsel to make comments suggesting Appellant had a duty to call witnesses, put on evidence, or suggest any duty to prove his own innocence.

Trial defense counsel made no objections to the burden-shifting arguments. The military judge did not issue any curative instructions, sua sponte or otherwise. Rather, the military judge gave the members standard instructions on the law, including how to consider the findings arguments of counsel. Nevertheless, I find error of a constitutional dimension because the military judge improperly allowed trial counsel to shift the burden of proof to the Defense when he suggested the members seek answers from the Defense in determining whether Appellant was guilty or not guilty.

As our superior court stated in *Czekala*, such burden shifting "violates the core legal standard of criminal proceedings . . . that the Government always bears the burden of proof to . . . persuade the members of guilt beyond a reasonable doubt." 42 M.J. at 170. Appellant's case is also similar to *Mason*, where trial counsel improperly suggested the accused was obligated to prove his own innocence by providing an explanation why neither party requested a DNA retest. 59 M.J. at 423. In this case, trial counsel suggested Appellant was obligated to provide evidence and an alternate explanation for the bruises or prove untruthfulness of witnesses. Moreover, this court has previously found it improper "for trial counsel to make comments suggesting [an accused] had a duty to offer evidence to prove his innocence." *Crosser*, unpub. op. at *14. In this connection, trial counsel's remarks posed a legitimate risk of improperly swaying panel members, especially in light of the weak evidence in this case. I analyze whether the constitutional error was harmless beyond a reasonable doubt *infra*.

Trial counsel also made other statements amounting to prosecutorial misconduct where I apply plain error analysis.

### b. Trial Counsel's Interjection of Personal Views

During trial counsel's closing remarks to the members, he repeatedly interjected his personal views, to include characterizing the defense case as one of "conspiracy theories," and making personal assurances as to the quality of the evidence. Defense counsel never referred to its case as a case of conspiracy theories—it was trial counsel who interjected this theory from his personal views of the case. In reference to the case as a whole, he told the members, "[T]his makes sense. The allegations that you have, the narrative that you've been told . . . makes sense. It rings true." These types of statements do not invite the members to make their own decision based on the evidence, but instead instructs the members as to the state of the evidence according to trial counsel's view. Essentially, trial counsel is saying, as a legal representative of the Government, this is the way it is, you should trust me, and that is the way you need to see the case.

Trial counsel expressed his personal views again while discussing the photographic evidence when he asked, "Why would [CC] take these pictures? Why does someone take pictures of multiple bruises on their body if not but to document as she said what had happened to her? She had been abused." Trial counsel further asserted, "[S]he needed it documented because she had been abused[,]" and, "*That is the only reasonable explanation*." (Emphasis added). Whether or not CC had been assaulted (abused) was a question for the factfinders and was not for trial counsel to interject as a matter of fact from his own personal opinion. Trial counsel had invaded the province of the members by injecting his own personal conclusions as to whether CC was assaulted or not. Making more egregious the insertion of his personal opinion that abuse was the "only reasonable explanation," was the fact trial counsel said this knowing CC had admitted to biases as to why she would allege the offenses against Appellant—she wanted him to lose his ability to become an Air Force pilot and had become increasingly frustrated when her complaining about Appellant's use of adult entertainment websites had no effect on him. Additionally, pursuant to her religious beliefs and the opinions of those close to her, Appellant's penchant for engaging women online was something for CC to work out in counseling, but not a valid basis for divorce. However, divorce could be forgiven if physical assault was the basis thereof.

While CC claimed Appellant had assaulted and bruised her as early as January 2021, she had not taken pictures until close in time to, and likely after, her decision to leave the relationship in May/June 2021—the pictures having been taken on 21 May 2021. The timing begs the question as to why she would take pictures on that day. Looking at the pictures, which leave questions as to what bruise or bruises supposedly corroborated her testimony, and considering CC's testimony of when the interaction with Appellant occurred and when she took the pictures, which are inconsistent, there is potential for other reasonable explanations as to why she took the pictures at that time.

Interestingly, and maybe most importantly, on or about 8 May 2021, CC went to visit her sister in Florida. During this visit, CC complained about her marriage but never complained about any physical abuse—her sister advised CC to go to counseling. According to CC, shortly after she returned home her sister stated that if Appellant ever got physical with her, they, seemingly meaning CC's family in Florida, would come and get her. It is not unreasonable to believe the defense theory that CC had all she could take of being disrespected by Appellant's online engagements, realized he would not change and really did not care to change, and also realized that if she was to be justified in leaving him, she would have to claim she was physically abused. In light of the facts that came out at trial, it was improper for trial counsel to argue his

personal view that the only reasonable explanation for CC to take pictures was because "she had been abused."

### c. Improper Vouching

Trial counsel also engaged in prosecutorial misconduct by vouching multiple times for the credibility of witnesses, especially that of CC, the Government's primary witness in the case. Even the majority alludes that trial counsel's statements may be improper when it comes to improper bolstering and vouching, but "nevertheless [is] confident the court members convicted Appellant on the basis of the evidence alone." In addressing CC's overall credibility, trial counsel stated, "You have the victim, [CC], who came up here and took the stand and she was credible. She doesn't have a reason to lie. She doesn't have any reason to make this up." He did not say, "The evidence showed that CC is a credible witness." Trial counsel specifically vouched for CC by saying "she was credible" and according to the law, trial counsel are specifically "forbidden from improperly vouching for the credibility of witnesses." *Necoechea*, 986 F.2d at 1276.

Trial counsel further vouched when he addressed the issue of whether CC had a motive to fabricate when he personally asked the panel to "think about . . . how is a victim supposed to feel . . . is she supposed to say no accountability . . . those are the words of the victim. Those are the words of someone who has been abused over the course of many months . . . ." In trial counsel's rebuttal argument, he responded to trial defense counsel's argument as is permitted. However, it was a bridge too far for him to invite members, as he did, to essentially step into the shoes of the alleged victim while he vouched for her testimony as being "the words of the victim . . . the words of someone who has been abused over the course of many months."

As noted above, counsel for the Government may not offer his or her personal opinions about the evidence or the accused's guilt. *Sewell*, 76 M.J. at 18. "This is a dangerous practice because 'when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore'" this opinion, even if "'biased and baseless . . . in fact.'" *Fletcher*, 62 M.J. at 180 (citing *United States v. Modica*, 663 F. 2d 1173, 1178–79 (2d Cir. 1981)). "Such tactics are not to be condoned. They tilt the scales of justice, risk prejudicing the [accused], and carry the potential for distracting the jury from its assigned task of assessing the credibility based solely on the evidence presented at trial and the demeanor of the witnesses." *Id.* (quoting *United States v. Perez–Ruiz*, 353 F.3d 1, 9–10 (1st Cir. 2003)).

### d. Maligning Defense

Trial counsel committed further misconduct during his closing arguments by maligning the Defense's case. Trial counsel from the outset characterized the Government's case as one of domestic violence, although it was not charged as such, and went on to paint the Defense's case as one of a "giant conspiracy theory." As to the overall Defense, trial counsel opined, "Members, the [D]efense can get up here and come up with any *conspiracy theories* they want, but that's not reasonable . . . . You have the corroborating evidence you need to know that this happened." (Emphasis added). When trial counsel argued the two co-workers' testimonies were credible, he invited members to believe that what Defense was doing was attempting to mislead the court by saying, "Think about this, *this grand conspiracy theory*, when you have two different witnesses – what are the chances? Think about yourselves and any coworker you might have . . . and then to have two individuals during two different charted time frames. You absolutely have all of the corroboration you need[.]" While trial defense counsel argued bias on the part of certain witnesses, it is only trial counsel who regarded the defense theory of the case as a "conspiracy theory," or addressed the Appellant as having committed domestic violence, and did so several times during his arguments. Even before trial defense counsel had an opportunity to make a closing argument, trial counsel was effectively planting these theories early on into the minds of the members to ensure they would convict Appellant—inevitably invading the purview of their fact-finding responsibilities, but also vouching for the two co-workers and misstating facts about their testimonies.

Rebuttal argument, of which only trial counsel has the privilege as the Government has the burden of proof and thus has the last word, began with trial counsel immediately alleging trial defense counsel's closing argument was disingenuous—specifically stating, "I'm not going to walk you through all of the *misstatements of fact* . . . ," (emphasis added), insinuating trial defense counsel was not honest with the panel in his argument. Trial counsel impugned trial defense counsel's credibility by characterizing their case as one of conspiracy theories, and misrepresentations at the same time he offered his unsolicited personal views on such evidence. Such argument is plain and obvious error.

### e. Improper Use of Facts Not in Evidence

In addition to arguments already addressed above, trial counsel improperly referred to facts not in evidence by saying, "[SM] knew what these bruises were. There's a reason she's asking the victim about whether there is violence

at home because she can see the bruises and she knows."[4] This argument was made in light of SM stating she did not know the origin of the bruises, she did not see a bite mark, she did not know when she saw the bruises, specifically stating she was "not sure when in that period [November 2020–mid-January 2021] [she] saw bruises, just throughout periodically," and CC had specifically denied to SM Appellant abused her. Moreover, even knowing SM's actual testimony, trial counsel inartfully argued:

> January working together at [the retail store] and [SM] saw a bruise and [SM] mentioned that specifically that when [CC] lifted up her sleeve she saw a bruise on her arm in that same timeframe [insinuating mid-January 2021] as the bite on her arm.

Given SM never testified "when [CC] lifted up her sleeve" nor that any bruising she might have seen was necessarily in the timeframe of the alleged bite nor that she saw a bite mark, this amounted to impermissible argument of facts not in evidence.

Trial counsel argued throughout that CC got a bruise from falling on her knee. CC characterized the picture of her knee as "the one where [her] knee is red," not as a picture where her knee is bruised. If the suggested corroboration from that picture was the redness on her knee, one could get a red knee by merely leaning on it to clean or do yoga for example, whereas characterizing the picture as trial counsel did, as depicting a bruise, makes the nature of what is depicted seem more severe than described by CC.

Counsel for the Government is free to argue the evidence in the court-martial record and reasonable inferences flowing from such evidence. *Hasan*, 84 M.J. at 220. Trial counsel is prohibited, however, from referring to facts not in evidence, especially when the remarks are "aimed directly" at Appellant's defense, as opposed to "extraneous commentary." *Fletcher*, 62 M.J. at 185. Appellant's defense was that CC made up the allegations and the two co-workers were biased due to friendship and offered little to no evidence to support CC's allegations. Recharacterizing evidence, arguing that SM knew the origin of the bite bruise, arguing SM saw the bruise when CC lifted her sleeve, and then

---

[4] On this issue, SM testified that at no point while she and CC worked together did CC claim Appellant abused her in any way. On redirect, trial counsel asked SM "Did you guys ever discuss whether that was physical abuse at the time when these bruises were something that you were seeing?" SM answered, "We had discussed it a little bit, just like inferring it, I guess, and then like I said at the time she denied it just saying literally it was like anything else."

vouching for her testimony are remarks exaggerated to hit directly at Appellant's defense and overcome the weakness of the Government's case.

### 3. Plain Error Prejudice to Appellant

Finding plain and obvious error, I now turn to evaluate whether prejudice occurred. I first look at the severity of the misconduct in context of the entire court-martial. *See Fletcher*, 62 M.J. at 184; *Baer*, 53 M.J. at 238. Appellant's trial on the merits lasted approximately one day, and trial counsel made multiple improper arguments and remarks during approximately 40 minutes of combined closing and rebuttal arguments. While my colleagues consider this to be a "lengthy" argument, in my estimation this is a brief argument, which was riddled from top to bottom with the inappropriate statements I have addressed, as well as limited reference to any evidence. As is standard, trial counsel introduced himself from the outset as the spokesperson for the Government. This, in and of itself, is not improper.

However, after trial counsel essentially took on the persona of the Government, his improper arguments and burden-shifting comments amounted to a general thematic discourse that dominated the Government's theory of the case. He wove his burden shifting, personal views, vouching of the key witness, disparagement of the defense case, and assertion of facts not in evidence into central themes of the Government's case. In doing so, he undoubtedly made these improper tactics all the more effective in convincing the members to believe trial counsel's position on the case when the members' proper task was to focus on the evidence—evidence that was essentially non-existent as testimony and documentary evidence diminished CC's claims and the essential elements the Government was required to prove. Additionally, my colleagues stated multiple times that trial counsel was addressing defense counsel's arguments, but I find many of the impermissible statements were made in the original closing argument, well before trial defense counsel made their closing argument. Employing such impermissible arguments very likely influenced the listeners and invaded the province of fact finding that is solely the purview of the members.

Next, we look at whether there were any curative measures taken. As discussed above, trial defense counsel did not object to any of trial counsel's improper remarks and the military judge did not sua sponte undertake any specific curative measures. To be sure, the lack of a defense objection to a prosecutor's improper comments is often indicative of their minimal impact. The same is often true when a military judge takes no remedial action sua sponte. Here, however, where trial counsel so thoroughly saturated his closing and rebuttal arguments with impropriety, it is a mystery as to why the military judge, at the very least, did not step in to address and attempt to cure the

improprieties. I refrain from determining if the military judge erred by not issuing curative instructions sua sponte.

Finally, I consider the strength of the evidence against Appellant. In the case at bar the Government's evidence was scant. Trial counsel elicited testimony of the alleged misconduct from CC and then produced other witness testimony, texts, and photographs that purported to corroborate the offenses for which Appellant was convicted, but in reality, such purported corroboration was littered with inconsistencies and did little to nothing to support CC's allegations nor make the Government's case even "moderately strong." Some of the evidence actually countered Government's theory of the case and CC's testimony. The Government had weak evidence, and but for the trial counsel's attempts to misalign the evidence in his closing arguments, the results of Appellant's case would have been different.

I recognize the Government may meet its burden to prove each element of an offense beyond a reasonable doubt through testimony of only one witness and corroboration is not required. In this case, the Government relied on CC to relay the facts to support all four specifications of the Charge. Her testimony alone was insufficient to support convictions for two of the four charged specifications as seen by the members' decision to find Appellant not guilty. The charges of which Appellant was convicted are those trial counsel argued strenuously, and on many points improperly, that there was corroboration through the photos, texts, and CC's co-workers' testimony. Because the evidence purporting to corroborate CC's testimony was slight at best and because trial counsel made improper arguments when specifically addressing the meaning and weight of such evidence there is simply no way to be sure the panel convicted based on the evidence, rather than undue persuasion by trial counsel employing improper argument.

Given the weaknesses in the Government's case, I have grave concerns regarding the fairness and integrity of Appellant's court-martial. After considering the entire record, I am not convinced that the members convicted Appellant based solely on the evidence of his guilt and, therefore, I find material prejudice.

### 4. Error Harmless Beyond Reasonable Doubt

As stated above, I find trial counsel erred and made multiple improper statements in his closing and rebuttal arguments, specifically by shifting the burden of proof to the Defense regarding an element of the offenses, an obligation for Appellant to produce evidence of innocence, and/or suggesting Appellant had an obligation to offer alternate explanations for alleged bruising on CC. This court has concluded that it was "clear error for the trial counsel to

make comments suggesting Appellant had a duty to offer evidence to prove his innocence," and that it was "clear error when the military judge failed to sua sponte instruct the court members that Appellant had no duty to call witnesses or put on evidence." *Crosser*, unpub. op. at \*14. If the Government shifts the burden of proof to Appellant, the standard shifts to the Government to show the error was harmless beyond a reasonable doubt. *Mason*, 59 M.J. at 424. The test for determining if the error was harmless beyond a reasonable doubt is "whether, beyond a reasonable doubt, the error did not contribute to [Appellant's] conviction or sentence." *Prasad*, 80 M.J. at 29. "Where a court cannot be certain that the [error] did not taint the proceedings, or otherwise contribute to the defendant's conviction or sentence, there is prejudice." *Id.* at 29 (citing *United Sates v. Williams*, 77 M.J. 459, 464 (C.A.A.F. 2018) (internal quotation marks and additional citation omitted). Given the relative weakness of the Government's case, I find it was error for trial counsel to implore the members to seek answers from the Defense by improperly shifting that burden to Appellant. This is error of a constitutional dimension and the Government did not meet its burden to show the error was harmless beyond a reasonable doubt.

### 5. Cumulative Error Doctrine

To be certain, I find many independent arguments made by trial counsel to be plain and obvious error standing alone, even given the cumulative and overlapping nature of the errors in this case. Under the cumulative error doctrine, "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) (quoting *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A. 1992)). Trial counsel's misconduct, in light of the relatively short trial and brief findings and rebuttal arguments, was not "slight or confined to a single instance, but . . . pronounced and persistent, with a probably cumulative effect upon the jury which cannot be regarded as inconsequential." *Fletcher*, 62 M.J. at 185 (citing *Berger*, 295 U.S. at 89). The cumulative effect of all plain errors and preserved errors is reviewed de novo. *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999).

In Appellant's case, I find the cumulative prejudicial effect of trial counsel's improper statements to the court members, and the military judge's failure to provide a curative instruction, necessitates a remedy. Taken as a whole, this

prosecutorial misconduct was damaging to the point where one cannot be confident that the members convicted Appellant on the basis of the evidence alone, thus, in my opinion, relief is required.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court